Thank you. We'll call our one case for this afternoon in Re Horizon Healthcare Services Inc. Data Breach Litigation. And Mr. Shork. Good afternoon. You may proceed whenever you're ready. May it please the court, my name is Eric Shork. I represent plaintiffs and appellants. At this time, I'd like to reserve three minutes for rebuttal. Now, before the court today are two important issues relating to the contours of Article 3 standing, specifically as they relate to data breach class actions. The first issue, which I think should be simply resolved, is that in the lower court, plaintiff alleged claims relating to the breach that occurred at the headquarters of Horizon Blue Cross Blue Shield in New Jersey. Those specific first issue is whether plaintiff has standing to assert a claim under the Fair Credit Reporting Act for a willful violation of the act. Specifically, the failure of Blue Cross Blue Shield to maintain reasonable procedures designed to limit the furnishing of personal information or private information. So why don't we get right into that, okay? Help us out with what are we to do with Clapper, which is cited in Spokio. We held the case CAV for Spokio. Spokio comes out, in part relies on Clapper. And Clapper has, as you know, the language about risk being certainly impending, that there'll be certainly impending harm. What can you say about certainly impending harm, particularly as it pertains not so much to, you know, Plaintiff Rendiner, but Plaintiffs Diana McKelleny and Maisel. What can you tell us about certainly impending harm? Well, I would say that first and foremost, I mean, the language from Clapper essentially adopted largely the language from Lujan, which was decided decades before. So Clapper didn't change the law regarding Article III standing. And I think, honestly, if there's one point to take from Clapper, it's that it's what you would describe as your stereotypical standing case. It's a case where somebody brought a lawsuit the day that an amendment to the Constitution was passed, as a constitutional challenge to the Congress's power to enact such an act. And the clear purpose of the lawsuit was to strike down the law, in effect to legislate through the courts. And, you know, in Clapper, number one, they applied an especially stringent standard because of the nature of the issues before it, because it was an attempt to strike down a law. Are you saying that there's a flexible standard here that sometimes it's certainly impending harm that we look to and sometimes it isn't certainly impending harm? Well, what I'm saying is that in the Court's jurisprudence over the last three decades, it has been a sliding scale. And I think that, you know, to get right to it, the best illustration of that perhaps is the Susan B. Anthony List case, which was decided after Clapper by a unanimous Supreme Court. And there, you know, just to briefly state what the facts were, there were some organizations out of Ohio that were bringing cases. They brought a challenge to a voting statute. Election law. Yes, voting statute. And the purpose of the Court held that these organizations had standing based on the fact that some person, even though there was no identification of that individual, in the future may bring a lawsuit under those circumstances. And the precedent that the Supreme Court was looking at in that, I think it was Justice Thomas' opinion, where they had, there was the threat of criminal enforcement. Okay? And the Court has a line of cases saying, well, you don't have to wait until you get prosecuted, particularly in free speech rights, when those are at stake. But we're clearly not dealing with the threat of criminal prosecution here or enforcement of a law like that. We're talking about a private dispute in which the allegations, at least as to those three, not Rindner, but the other three, is that nothing that we know of has happened. And it's all about, from your perspective, what might happen. Right? Well, I would, yes and no. With respect to all four plaintiffs, they've all four alleged wealth of violations of the Fair Credit Reporting Act. You're correct. I apologize. I guess I'm trying to take it out of the statutory violation piece for a moment, right? Because I think everybody will concede there's, that's an What you're talking about is, maybe somebody's going to get hurt down the road if they misuse the data that they got on these three. That's the allegation, right? Well, I think the allegation is that they've already been damaged by the fact that their information was stolen. And I do think that the facts of this breach are important, because it's something that the District Court really skipped over. This isn't a, as my colleagues have attempted to paint it, this isn't an instance like the SAIC case or the McKelney case where someone broke into a car and stole, you know, for instance, an SAIC, a car stereo and a laptop. Sorry, actually, there was backup tapes containing personal information. This is an instance where somebody walked into the largest health insurer in New Jersey, an insurer with 3.7 million individuals, in a building that's at least 11 floors high with 27, 24-7 security. You're making out all the reasons why they were maybe sloppy and bad, but that doesn't, we got to get to the issue about harm and risk of harm, right? Imagine the sloppiest, worst negligent treatment you can imagine. If nothing, if there's no risk of harm that comes from it for some reason, you wouldn't have a case, right? You wouldn't have standing. I thought you were arguing that this was targeted for purposes of obtaining the personal identifying information and the personal medical information, such that the risk is greater in this instance than it would be where a car is broken into and whatever's there is taken. Absolutely. And that's exactly what the point I was intending to make is that, you know, in addition to the facts I had stated, this is a building that, you know, based upon prior breach, had a significant number of laptops in it, many of which were equipped with a LoJack system. Isn't it interesting, though, that there were those, and I think we're pretty familiar with the facts, there were a number of thefts of laptops. The only allegation we have about anybody being compromised or identity being compromised is Mr. Ridner. That's the only allegation we have in front of us. So one could infer that, unlike Neiman Marcus, the point of the thefts was not the data, but the laptops. So I'm not sure that this helps your argument necessarily. See, I believe that the most logical inference, you know, given the facts that I've stated and the fact that they found two computers containing the personal information of 839,000 plus people on computer hard drives in that building, you know, broken, disabled the cable locks and left without being seen on the security cameras, supports that those laptops specifically were targeted. Okay. And for the information contained thereon. But how do you respond to Judge Jordan's concern about certainly impending harm, especially in light of Riley? We have precedent that binds us. It says the fact that data that is identifying data has been stolen in and of itself is insufficient to constitute injury in fact. How do we get around that? I actually think that Riley supports standing here because Riley expressly distinguishes Crotner, which is a case where a laptop containing names, addresses, and social security numbers was stolen. And one of the plaintiffs alleged having suffered harm shortly thereafter. Essentially exactly the same facts here. And the court said that's a remarkably different case from what was before it in Riley, where the court did not, you know, at least factually believe there was any evidence in the record that the information had even been stolen. And said, and then found articles. And so Riley itself is distinguished. When you say Riley is distinguished, distinguished, this is the language of Riley. Appellant's allegations of an increased risk of identity theft resulting from a security breach are insufficient to secure standing. Does that mean that, yeah, just talk to us about what are we to do with that language? Well, I think that, again, I think it's a, you know, as in all standing inquiries, it's a fact-based inquiry. I believe the facts here, based upon Riley's own language, are significantly more in favor of finding standing here. And Riley was decided five years ago. Did Google and Nickelodeon help you at all, these recent cases that we've got? Did you look at, consider whether those had any impact? I believe that Google and Nickelodeon made clear that, with respect to the willful violation of the Vicar Claim, that there's no question the plaintiffs have standing to assert that. It just reaffirms the position that's been the law for, you know, since the, you know, Wharton Havens line of cases in the 70s, that Congress has a right, Congress has the ability to define injury, which, you know, previously wouldn't have existed prior to the passage of such statutes. So, in that respect, I think Google and Nickelodeon are instructive. But I also think that, you know, getting back to the risk of harm cases, five years has passed since Riley. You know, just, you know, based upon the allegations of the complaint, it's just common knowledge. Data breaches are a real problem right now. We know a lot more about what's going on. There's a real black market that exists for this data, and it's harming real people. In Spokio, the court said after citing Clapper, the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. In such a case, a plaintiff need not allege any additional harm beyond the one identified by Congress. Is that our case? That's exactly our case. The figure was passed in part, you know, to protect the privacy of information provided to consumer reporting agencies. I mean, that's exactly our case. Well, it still goes on. I mean, I'm frank to say that I got a little bit of whiplash leading Spokio, because I thought we were going one direction, and you read the next paragraph, it looks like it may be going the other direction, and you read it a little more, and it looks like it's going another direction. You know, because it starts out saying tradition and Congress, what that says is important, but then it says Congress's role in elevating intentional harms does not mean a plaintiff automatically satisfies, but this doesn't mean that risk of real harm can't satisfy, and then the language that just got quoted by Judge Van Aske, but that doesn't mean that you've got a material risk of harm with harmless things like zip code. So, you know, what's the judge to do? That's Spokio, and there's some back and forth going on here. What is the takeaway from Spokio? I think the takeaway from Spokio, at least as it applies to this case, is that we don't have a purely procedural, you know, meaningless harm at issue. I mean, we've got a statute intending to protect the privacy of individuals. We have the theft of some of the most dangerous information. I mean, I know it's been quoted as the creme de la creme of information. But is the statute here really focused on ensuring that the covered agency, and we're assuming that they are, that the covered agency not furnished the information, doesn't really talk about protecting the information. So, how can we find, if we try to decipher what Spokio is telling us, we have to identify, presumably, does the statute set forth sort of a substantive right, and if the substantive right here that you claim was violated is the provision that says a covered agency should not furnish information. Well, here we don't have a furnishing, we have a theft. So, what right is implicated by this statute? Well, I believe that the specific right is the reasonable procedures, maintain reasonable procedures designed to limit the furnishing of information to permissible purpose under the act. And I can say this matter was actually briefed at the motion to dismiss stage with a health insurance company in the Roe v. Unicare stage. And the motion to dismiss was denied under, you know, different but analogous facts. Actually, these facts are probably stronger. I see that my time is up, at least for the initial argument. Okay, thank you. Okay, thanks. We'll have you back for rebuttal, Mr. Short. Mr. Chernoff. Thank you, Your Honor. May it please the Court, my name is Ken Chernoff. I represent Horizon Healthcare, the appellee in this matter, and we ask that the Court affirm the judgment of the District Court dismissing the case with prejudice for lack of standing. If I may, maybe I should just jump right into this issue we've just been discussing, the Court's been discussing with my opposing counsel here on Spokio and FCRA and the application of Spokio in light of Nickelodeon and the like. Because, Judge Jordan, I think your whiplash is something that I experienced myself, and Spokio is something of an opaque decision. But I think I can help, I can try to help the Court walk through at least how I view this application here. Good. Why don't you begin by helping us with the words, material risk. Because that's, it seems like when they're wrapping it up or getting toward the end that they start talking about material risk of harm and contrasting it with the zip code disclosure, which would be, you know, de minimis or silly. Is that the standard we're working with now, material risk of harm? That is one of the opaque aspects of the decision. And here's, so you're right to zoom in on that, Your Honor. So in Clapper, Justice Alito, excuse me, in Clapper, the Court set forth the standard for the risk of future injury constituting harm being certainly impending. That was a standard that the Court applied. Which feels a little different than material risk of harm, doesn't it? It sounds a little different. I would venture to say this, Your Honor. In Clapper, the Court has a very long and detailed analysis of the issue as to what constitutes enough evidence, enough information to be sufficient to support standing. And the Court uses, it settles on the certainly impending standard. Now in Spokio, the Court uses two different phrases, real risk at some point and material risk at another point. There's no... They say a risk of real harm. A risk of real harm, excuse me. And then they say a material risk of harm. So it's like the risk has to be material and the harm has to be real. Okay. What does that do for us? Is that different? Sounds like it's different than this sort of immediately impending stuff from Clapper. It could sound different. My view on that, Your Honor, although there's no explanation in the Spokio decision itself, is that the Court was not trying to alter the standard in any prior decision. It was using, frankly, shorthand to talk about some risk. And there's no... Because there's no analysis behind material risk. And maybe I can... Well, I don't interrupt You know, when you say it's a shorthand, that certainly doesn't sound like shorthand for what was going on in Clapper. It sounds... Maybe it's just me, but if you say that the risk has to be certainly impending and substantial, which is the language from Clapper, that sure sounds different to me than a material risk. Well, I believe that... I think it could sound different. I don't think that there's any analysis behind Spokio to suggest that it's different. But I think if I walk... Is it different because of the congressional aspect of this? That's right. I think if I walk through the way Spokio operates as applied to this case, I think my conclusion is that it doesn't, in the end, make a material difference, whether we're talking about the material risk or certainly impending standard in Clapper. And here's why. So what Spokio says, I think clearly, is that the mere violation of a federal statute in and of itself is not sufficient injury to support standing under Article III. There still has to be an allegation, a plausible allegation, of some particularized and concrete injury, and that concrete injury must be real and not abstract. But it can be a risk, right? It can be a risk of real harm, because Judge Van Aske quoted perfectly the language where the court talks about a violation of procedural right can be sufficient in some circumstances to constitute an injury in fact. So on that point, Your Honor, when the court talks about... So the court says, must be a concrete injury, can be intangible, can be a risk of future injury. When it mentions the risk of future injury, it cites to one decision. And the one decision it cites to is Clapper. So from that, I think that the best reading of the decision is that when it's talking about what standards apply to an analysis of a risk of future injury, it's referring to Justice Alito's own decision. Could you comment on Justice Thomas' concurring opinion where he talks about the difference between enforcing private rights and public rights, and that in certain circumstances the invasion of a private right in and of itself, without any other allegation of actual harm, would be sufficient to confer standing? And then he gives an example, trespass, as an instance of the invasion of a personal right that can be... for which you have standing to sue even though you have not suffered actual harm. Right. And I think I would comment on his opinion by referring back actually to the majority opinion, because it does dovetail back into the majority opinion. So to continue on with the analysis, the Supreme Court, the majority opinion in Spokio says if it's an intangible injury, we're going to look to things like whether the injury asserted is the kind of injury that courts have historically recognized. Or, and sometimes it may be relevant to look at congressional intent behind what Congress... And that's what we're dealing with here, right? Exactly. Well, and in Spokio itself, the court says ultimately, when it sends it back to the Ninth Circuit, we're not saying there's not a concrete injury here. We're just saying you need to talk about it. And here's a case where, you know, what was at stake? They had misdescribed some things about this fellow. That was it. There was nothing else going on, right? And that was enough for the court to say, maybe that's concrete. You take a look at it and actually discuss it. Precisely. So in this case, where we get to, I think, is that there was at most a bare procedural violation alleged. And here's why, Your Honor. So this is a case, to the extent you're going to look to congressional purpose, to congressional intent, the statute that they've sued under is the Fair Credit Reporting Act. And the portion of the Fair Credit Reporting Act that they sued under is this reasonable procedures provision. Now, the reasonable procedures provision is not a data breach security section. Section 15 U.S.C. Section 1681E is the reasonable procedures provision. And it talks about having companies put in place procedures that require prospective users of the information to identify themselves, certify the purpose for which the information is sought, certify the information will be used for no other purpose. There's nothing in there about protection from theft or the like. It's about, to Judge Schwartz's question, the improper furnishment or disclosure. Well, aren't those sort of 12b-6 merits arguments? I mean, aren't those arguments that go more to the question of, look, the court's got subject matter jurisdiction, but this is a Yeah, that's a good question. But in this case, I think the answer is no, because the Supreme Court, the majority opinion in Spokio does say, for standing purposes under 12b-1, when you're trying to analyze whether or not plaintiff even has subject matter jurisdiction to be, whether the court has subject matter jurisdiction over the plaintiff's claims, you can look at congressional intent with congressional purpose to see if the harm alleged is the kind of harm that Congress can be said to have wanted to elevate to the level of injury for purposes of, injury in fact, for purposes of In 1681 subsection b, it talks about the purpose of this subchapter is to require that credit reporting agencies adopt reasonable procedures, break and quote, with regard to confidentiality. So is there anything that we can take away from that and how it overlays on the furnishing provision? Exactly right, Your Honor. Confidentiality with regard to whom, it's about to whom the plaintiff is going to furnish a report. Exactly. And so, you know, as I looked at this issue in the wake of Spokio and the wake of the supplemental letters that the party submitted, you know, it really, and this ties into the Nickelodeon decision, it really comes down to what is the harm that Congress intended to remedy by way of the provisions that plaintiffs are relying on, appellants are relying on, this reasonable procedures provision. The kind of harm that Congress intended to be elevated to the level of injury for purposes of standing. And the Fifth Circuit does have a case, if I may, Your Honor, which was not cited in the brief, so I apologize, but since this issue is emerging rapidly, it's Washington v. CSC. It can be found at 199 F. 3rd, 263 at page 267. It's the Fifth Circuit from 2000. And the Court specifically kind of walks through FCRA and concludes that the harm, this is a quote, the harm FCRA envisions is disclosure, not that reasonable procedures were not followed and then something bad happens. Well, you know, that just feels so much like you're drawing into a merits discussion, you know. You're, the district court decided you were successful in persuading a fine district court judge that this is really about jurisdiction. But I thought we had some case law out there that said if it looks like you're in any kind of a gray area between the merits and the jurisdiction, you go ahead and take jurisdiction and then you decide the case on the merits. Are you not leading us into a gray area between the merits and between 12b1 and 12b6? I think the, I think it's not a gray area. I actually think it's reasonably black and white. And I would say, Your Honor, that if the court were to find stand, were to permit standing, to find standing exists in this case based on nothing more than allegations of a theft of two laptops and allowing the plaintiffs to manufacture standing simply by converting it into a FCRA claim, the courts are going to see a flood of frivolous data, quote, data breach lawsuits like this one, which is not even a data breach. It's a case about two or so laptops. Well, if they're really frivolous, then I guess there's all sorts of sanctions for them. But, and there is certainly, it's certainly the case if something is so frivolous that, you know, if somebody said I'm invoking the Federal Energy Regulatory Act to sue you for the theft of my laptop, well, yeah, I can see that's so frivolous that things don't mesh up here at all. But here we have a, seems to have been a straight enough face argument that you spent a lot of time litigating it and we're litigating it here and we've got cases from around the country. You've just noted that this is a rapidly developing field of law. So, evidently it's in dispute more than just in this circuit. Is that really so frivolous that it just, there's just flat no jurisdiction? I think, I think, I think that when I was referring to frivolous, I meant the underlying, underlying lawsuit. Here the use of, the merits. Precisely. Let me ask you a question about the fact that you immediately, or when you discovered this breach, you subsequently offered identity theft insurance and credit protection insurance. Doesn't that suggest that there's an injury that's been sustained here? The fact that, it's suggesting to me that a prudent person in those circumstances would go out and procure that insurance if it wasn't provided to them. It's a good question, Your Honor. Here what Horizon did was make an offer of a voluntary, a voluntary offer of credit monitoring protection for potentially impacted customers. That same offer was made in the Riley case. And the court, this court did not deem that to be germane to concluding that it's somehow an admission of risk of harm. In fact, I would venture to say that it would be an unfortunate outcome if a court were to hold that the mere offering of credit monitoring insurance protection is an admission of liability. I wouldn't view it as an admission of liability, but not liability at all, but a recognition that there's a risk of harm. And so what does a prudent person do to avoid the risk of harm? They procure insurance. Well, that's a good question, Your Honor, but two things on that. First of all, the court did address this, and Riley did consider the fact that there was credit monitoring offered there and didn't factor that in as something that would suggest a risk of future harm. Moreover, in the Supreme Court decision in Clapper, the court did observe that even though somebody might be reasonably prudent in taking action to protect themselves from a risk of future harm, that alone is not enough to support a finding of a risk of future harm. If they have to wait, if they've got to wait for the harm to actually materialize, doesn't that get its own risks of, to standing? I mean, there's a California case where a court thoughtfully said something along the lines of, if you wait for the actual theft to happen, and it takes a year or so to occur, well, then you're going to hear the defendant come in and say, who knows whether it happened because of the theft of the laptop or not. It could have been other stuff, right? So by saying you have to wait until you can actually say, oh, it's not just a risk of harm, or a material risk of harm, now it's realized harm, aren't you building a catch-22 into the system, Mr. Chairman? So I think Your Honor is referring possibly to the Adobe case. And so the Adobe case is similar in some respects to cases like the Neiman Marcus case out of the Seventh Circuit, which I view as very different cases, and the difference is important. I think in all of these standing cases, whether we're talking about the case at Barr, Adobe, Neiman Marcus, or even Spokio or Nickelodeon, which we can talk about as well, the facts alleged, not the speculation alleged, but the facts alleged matter. So in both Adobe and in Neiman Marcus, putting aside whether they're correctly decided or not, they're both very different cases. They involve intentional network hacks by a third party, which resulted in thousands of instances of actual alleged impact on individuals. Neither of those two facts are alleged. Well, you don't have a hack unless you consider a hack saw a hack. Someone went there and sawed through a chain and stole a laptop. In a way that one might reasonably, if you're viewing all the facts in the light most favorable to the plaintiffs, might say they didn't take those laptops at random. They took those laptops because they had personal identifying information on them. So Riley dealt with an actual hack, not a hack saw hack, but an actual hack. Right, and Riley is five years old, and that's the question, right? Is our law now different in light of Nickelodeon, in light of Google, in light of Spokio? Is our law different? Right, so let me, this is very important, I know my time is up. May I answer that question? Because there's two very important things I think I should add on this point. Point, thing one is Riley, five years old, which is not that old, and indeed has been a leading precedent in this space ever since it was decided. Not only that, but the legal standard applied by this court in Riley is almost verbatim the precise same standard applied by the Supreme Court in Clapper. So far from being out of the name, Riley is right in the name. Moreover, I do want to return to Nickelodeon, because I think it's a very recent decision in this court. But it really speaks in my mind to this, not to the Riley issue, but to what I'm calling the Spokio FICRA issue. And in Nickelodeon, the court concludes that there's sufficient jurisdiction that there is concrete injury under Spokio, because the allegation of injury there was one, as I was talking about before, the kind of injury that was recognized historically or that Congress intended to be remedied here. And that injury was the... Unlawful disclosure of legally protected information. Precisely, the unlawful disclosure, the affirmative disclosure, which is exactly what FICRA is about. The unlawful disclosure or furnishment of data, not about the theft. Can I ask one more question? Sure, please. I'm going back to Justice Thomas's opinion. And he said, in that case, they're dealing with Section 1681B. He said, requires Spokio to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates. If Congress has created a private duty owed personally to Robbins to protect his information, then the violation of the legal duty suffices for Article III, injury in fact. Is that the nature of the inquiry we should undertake with respect to the allegation here, the alleged violation here, whether or not that was a duty that Congress intended to be owed personally to these 877,000 people? The duty, if any, the duty is to prevent the disclosure or furnishment of protected information. And here there's been no plausible allegation of the disclosure or furnishment of protected information. Well, I've got to ask, is the allegation that you were so negligent in how you dealt with this information that it amounted to this? I mean, I take their argument to be you didn't disclose it in the sense that you printed up a report and sent it out. The allegation is you effectively disclosed it by being woefully inadequate in protecting it and that that made it accessible to people who shouldn't have it. It was a de facto disclosure by negligence. That seems to be the theory that they're putting forth to us. What's wrong with that? It is a theory, and that's why all these cases come back to each other. That's why Riley is so important. So Riley says that chain of causation, that chain of connection is broken when you have multiple steps of speculation that you have to go through. Riley involved a hacker who read, copied. Riley said in order to find standing you have to speculate that the hacker read, copied, and understood the information, intends to commit future criminal acts, and is able to use the information. And this case presents even more levels of speculation that you would need to indulge. But what Spokio adds is the question that the recognition that in some instances the violation of a procedural right created by statute in some circumstances would be sufficient. And the question I think is, is this the type of statute we have here? I don't think the Riley analysis applies to that question. Correct. And the Supreme Court says, but not if it's a bare procedural violation and produces no harm, like the zip code, the incorrect zip code example. I would venture to say, and this might be a good place to close, although I'm happy to keep talking, at most what plaintiffs have alleged here, what appellants have alleged here, is really akin to a bare procedural violation because they've been able to come forward with no plausible evidence that any harm has befallen them. So you're intersecting the assuming there's a duty, as described by Judge Jordan, to ensure there's adequate protection so there's not de facto disclosure under the allegations in this case because the thing disclosed has not caused injury, there's no injury in fact under Riley? Are we, because I think Judge Van Aske is suggesting we should look at them separately. Are you suggesting we should look at them in companion? I think you could look at them both separately, actually. There's neither a disclosure, nor did any disclosure cause any harm. Well, that raises the interesting point, and you're well past your time, but you said no harm at all. We haven't spoken at all really about Mitchell Rindner. I'm happy to do that. Should we spend just a minute on that, Your Honor? Why don't you just, since it sure sounded to me like he was saying, yeah, I was injured, they stole my stuff, they filed a tax return, I eventually got it unwound, but it caused me some significant transaction costs and difficulty. Why is that not actual harm? And even if we accepted that the other three didn't have standing, if Rindner alone has standing, isn't that enough to mean that the district court got this wrong? To be sure, Plaintiff Rindner alleges that he suffered some injuries, some impact as a result of the theft of the tapes. But in order to constitute an actionable injury, for purposes of standing at least, he has to allege facts that lead to a plausible inference of traceability to the laptops. His allegations are internally inconsistent. They render our connection traceability to the laptop theft implausible. And just, if I may, Your Honor, briefly, so he alleges two fundamental facts to support his argument about traceability. First, he contends that there was a fraudulent charge on one of his credit cards. But as we've pointed out in our briefs, credit card numbers were not on the stolen laptops. To be sure, his brief is full of speculation as to how someone might be able to get his credit card number some other way, but that's speculation about getting it some other way. His second fact is that somebody filed a fraudulent tax return in his name, excuse me, in his wife's name. But as we've also argued, his wife's social security number, which would be needed to file a tax return, was not alleged to be on the stolen laptops. And he comes up with arguments in his brief as to how, well, somebody could have gotten her social security number from some other source and then combined it. But what you have here is not plausible allegations, but excuses for implausible allegations layered on top of each other, coupled with, as Your Honor has pointed out, three other plaintiffs who concede not a thing even close to this that has happened to them. Okay. Thanks very much, Mr. Chernow. Thank you very much. I appreciate the time, Your Honor. Mr. Short. I just have a few points to address on rebuttal. I think first and foremost, with respect to Mitchell Ridener, and this is something that was, from our perspective, was incorrect about the district court's ruling, is yes, Mitchell Ridener alleges that his information, including his social security number, was stolen, that he was a meticulous protector of his private information, and that shortly thereafter he had a fraudulent income tax return filed in his name. He took a bunch of time dealing with that as well. But the fact that we didn't allege in the complaint that his wife's information was in there, you know, doesn't mean that the income tax return, the fraudulent income tax return, was not as a result of the theft. We notified the district court, and I know it's in our brief here, if we'd been given leave to amend or if we'd amended, we would have alleged that his wife's social security number was provided along with the application. So to state that, hey, we need to jump through all these hoops and come up with an alternative source of data, it's simply incorrect. I think drawing the inferences in plaintiff's favor and just based upon the facts of the complaint, his social security number was on the laptops that were stolen in unencrypted format through a sophisticated and malicious hack as their theft. And then shortly thereafter, the fraudulent tax return occurred. Well, it's a little tough for you, isn't it? Because the tax return couldn't have been filed without, since it was a joint return, the wife's personal information. And even though you say we could have amended the allegations in the complaint, they are what they are. There is no allegation. So, I mean, we view them in the light most favorable to your client, but that doesn't mean we make up stuff for your client, does it? No. But the information, Rittner's information, was in the returns. We do allege, you know, more than plausibly, that it came as a result of the breach. And the fact that his wife's, you know, that specific allegation wasn't in there, especially for standing purposes, I don't think we need to go any further than that on that topic. Now, just to touch upon a few other points, I think we touched on it earlier. One of the quotes, and this is from the Neiman Marcus argument, was that the letters regarding the data breach that offered the credit monitoring, one of the comments from Judge Wood there was that, you know, doing so, it was a recognition that there was a real risk of harm, because otherwise the defendant, you know, there, Neiman Marcus, would have been acting in an economically irrational manner. And that's true here, too. Has the standard changed? Is the material risk of real harm different than certainly impending harm? I think it's always been a sliding scale, but a real risk of harm or a material risk of harm or an actual risk of harm, I mean, if you look back through the decades, the language that's been used has been a sliding scale. And, yes, I do think that the standing has, right now, in these types of cases especially, changed. Can I leave to answer your question? Yes, please. And I think you see that. I think you see that in the Seventh Circuit's recent decision in the P.F. Chang case, which followed up on the Neiman Marcus case, which followed up on the Adobe case. But those cases, everybody had, somebody had a cognizable injury, or data was used in some way to cause a fraud. So, I mean, those are hard for us to use as analogies. Here we have only the risk. Putting aside Mr. Ritter. Well, I will say in the P.F. Chang case, there was a dispute between the parties as to whether the information was actually, the plaintiff's information was actually stolen and whether that information caused any harm. And one of the ways the district court said, well, that's more of a merits issue. Taking the allegations of the most favorable plaintiffs, you know, they have at least Article III standing to be here, and now proceed with the litigation. And that's, I mean, along the lines of, here we do think that we have, you know, I think our allegations established we've got to sophisticate that at the very least. I mean, to steal a laptop from health insurance headquarters with cameras and 24-7 security to choose those two laptops, gain authorized entries, which supports it was either an inside job or a vendor for falsifying materials, and then walk out. It does support that they were targeted. And given Ritter's allegation of actual tax return theft shortly thereafter, I do think that we get over that threshold. Thank you for your time. Thank you. Thanks for a well-argued case from both sides. It's helpful that we've got the matter under advisement. It's reasonable. All right. This court stands on recess until 3.30 p.m.